# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

ROBERT MACHLAN,

             Plaintiff,

   v.

DWIGHT NEVEN, *et al.,*

             Defendants.

3:13-cv-00337-MMD-VPC

**REPORT AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE**

       This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge.  The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4.  Before the court is plaintiff's motion for summary judgment (#34). Defendants opposed, and also filed a cross-motion (#44/45).  Plaintiff responded thereto (#70). Having thoroughly reviewed the record and all papers, the court recommends that plaintiff's motion be denied, and defendant's cross-motion be granted.

## I.     FACTUAL & PROCEDURAL BACKGROUND

       Plaintiff Robert Machlan ("plaintiff") is an inmate in the custody of the Nevada Department of Corrections ("NDOC").  Presently, plaintiff is incarcerated at Warm Springs Correctional Center ("WSCC") in Carson City, Nevada, but the events giving rise to this case occurred while plaintiff was held at Southern Desert Correctional Center ("SDCC") and High Desert State Prison ("HDSP"), both of which are located in Indian Springs, Nevada.  Acting *pro se*, plaintiff asserts several civil rights claims pursuant to 42 U.S.C. § 1983 against the following prison and NDOC officials: HDSP Warden Dwight Neven ("Neven"); HDSP Associate Warden Isidro Baca ("Baca"); HDSP Associate Warden Cole Morro ("Morro"); NDOC Director Greg Cox ("Cox"); NDOC Deputy Director Sheryl

Foster ("Foster"); HDSP Correctional Case Specialists Roland Daniels ("Daniels"), Anthony Ritz ("Ritz"), Jennifer Nash ("Nash"), and Larry Treadwell ("Treadwell"); SDCC Correctional Case Specialists Vincent Rabourn ("Rabourn"), Howell ("Howell"), Hill ("Hill"), and Graves ("Graves"); SDCC Warden Brian Williams ("Williams"); SDCC Associate Warden Cheryl Burson ("Burson"); NDOC Deputy Inspector General Greg Roehm ("Roehm"); Correctional Officers Lee Griggs ("Griggs") and Gregg Kanouff ("Kanouff"); and three Jane and John Doe defendants.  (#25 at 2-7). The Amended Complaint is unfocused and, at times, nearly indecipherable.  Nevertheless, it is plain that the alleged events underlying plaintiff's claims relate to a prison disciplinary hearing, due process procedures related thereto, the conditions of disciplinary segregation imposed as a result of his violations, and a dispute as to the proper release date.

On December 11, 2009, prison officials at SDCC, where plaintiff was then incarcerated, commenced disciplinary proceedings against him for two violations of the NDOC Code of Penal Discipline: extortion, and unauthorized use of mail.  Plaintiff alleges a variety of due process deficiencies related to the hearing.  He contends that, rather than receiving a written notice of charges for these alleged violations (#32 at 39), Kanouff merely read aloud the charges to him on December 14, 2009.  (*Id.* at 41.)  On January 11, 2010, Griggs presided over a disciplinary hearing at which he considered the charges.  Plaintiff attended the hearing.  According to plaintiff, Griggs committed several procedural missteps.  First, Griggs relied on evidence outside of the disciplinary record; plaintiff avers that Griggs told him that "he had been told to find the plaintiff guilty and therefore was finding him guilty . . . ."  (*Id.* at 43.)  Plaintiff contends this ostensible instruction constituted a basis for Griggs's decision, beyond Roehm's investigative report, the evidence, and testimony Griggs considered at the hearing.  (*Id.* at 43-44.)  Second, plaintiff alleges he was denied the ability to call his own witnesses at the hearing.  (*Id.* at 43.)  Finally, following the hearing,

plaintiff contends that he did not receive a statement of Griggs's findings or the sanctions Griggs imposed. (*Id.* at 40.)

In any case, after considering the evidence and hearing from plaintiff, Griggs found him guilty of both charges. Therefore, Griggs sentenced plaintiff to 790 days of disciplinary segregation: 730 days for the extortion charge, and 60 additional days for the use of mail violation. (*See id.* at 10-11.) Following the hearing, plaintiff avers that Williams and Burson precluded his right to appeal the sanctions. (*Id.* at 47.) According to plaintiff, he filed grievances about the alleged lack of procedural regularity at the hearing, but they and others denied each grievance as improper. (*Id.* at 47-48.) Further, when plaintiff raised the issue before the SDCC Classification Committee on April 29, 2010, Williams allegedly agreed with plaintiff's contentions about the lack of due process but, nevertheless, allowed the convictions to stand. (*Id.* at 47-48.)

Plaintiff's disciplinary segregation sentence began on January 11, 2010. Disciplinary segregation is a punitive sanction for inmate conduct violations, and it entails housing conditions that are, allegedly, "significantly more restrictive . . ., in terms of allowable property, telephone access, inmate store access, etc." (*Id.* at 17-18.) Although his segregation began at SDCC, he was transferred to HDSP to serve the remainder of his disciplinary sentence upon the approval of the SDCC Classification Committee in April 2010. According to plaintiff, HDSP has uneven topography and a "wide spread layout," is not classified as a "medical yard," and his cell assignment at that facility was on the upper tier. (*Id.* at 34-35.) Allegedly, these conditions conflicted with medical restrictions about which defendants were aware, restrictions that limited him to housing only in a "flat yard," a "medical yard," and in a lower-tier cell. (*Id.* at 20.) Although plaintiff's restrictions "all demonstrate[d] the serious nature" of his undescribed "medical conditions, injuries,

and disabilities[,]" defendants "forced upon him" these conditions, which threatened to exacerbate these "injuries." (*Id.*)

Plaintiff also maintains that, beyond these conditions, he was held in disciplinary segregation for an excessive period of time. Under the NDOC's good-time credits policy, plaintiff contends that should have received several thirty-day reductions to his 790-day segregation sentence; by his calculation, his period in segregation should have expired on October 16, 2011. (*Id.* at 11.) Yet he remained in segregation until March 22, 2012, at which time he was transferred to WSCC. (*See id.* at 21-22). Therefore, he alleges that he was held in disciplinary segregation for 251 days beyond the sentence imposed. (*Id.* at 10-11.) Implicitly, he claims that he did not receive such credits, and also that officials imposed upon him additional time in disciplinary segregation without charges, notice, or a hearing. In support of his assertion that the excess period was, in fact, disciplinary segregation, plaintiff alleges that defendants failed to serve upon him a "Notice of Administrative Segregation" and provide to him a classification hearing, by which he could have been properly reclassified and maintained in administrative segregation past October 16, 2011. (*Id.* at 12-13.) He further contends that other indicia support the conclusion he was held in disciplinary segregation, including the absence of monthly segregation reviews, and his continued presence in the same housing unit, since inmates in administrative segregation are housed in different areas of HDSP. (*Id.* at 15, 17.)

As a result of his continued disciplinary segregation status, he was deprived of "substantial inmate privileges," ranging from religious and educational services to recreational and employment opportunities. (*Id.* at 26.) In particular, plaintiff alleges that he was denied the ability to earn between fifteen and ninety work credits, which would have ultimately reduced the length of his sentence. (*Id.*) In addition, he avers that he was required to wear full manacle restraints on every

occasion in which he left his segregation unit, which unnecessarily caused him "discomfort, pain and suffering . . . ." (*Id*. at 36.)

In light of these factual allegations, plaintiff brings several claims, some more decipherable than others, against defendants in their individual capacities.   On October 23, 2013, this court entered a screening order (#3) pursuant to 28 U.S.C. § 1915A, in which the court permitted plaintiff to proceed on some, but not all, of the claims in the original Complaint's four counts.   (*See id*. at 3-7.)   Thereafter, the court granted plaintiff's motion to file an Amended Complaint (#31).   Therein, plaintiff reasserted many of the same allegations and claims, but he also restyled the pleading into three counts, asserted new liability theories, and added additional defendants.

In Count I,[1] plaintiff alleges claims against defendants Cox, Foster, Neven, Baca, Morro, Daniels, Ritz, Nash, Treadwell, and the Doe defendants.[2]   (#32 at 10, 12.)   First, these defendants denied him Fourteenth Amendment due process by holding him in disciplinary segregation at HDSP for 251 days in excess of his disciplinary sentence.   (*Id*. at 10-11.)   Alternatively, plaintiff seems to contend that, if he was reclassified to administrative segregation past October 16, defendants denied due process to plaintiff by failing to serve notice, hold a reclassification hearing, and allow his attendance at the same.   Second, these same defendants violated plaintiff's Eighth Amendment rights.   Because defendants were ostensibly aware of plaintiff's medical classification and restrictions, they were deliberately indifferent to the substantial risk of harm he faced by transferring him to HDSP for disciplinary segregation.   (*Id*. at 19-20.)   Additionally, plaintiff seems to suggest the very fact of the additional 251 days was cruel and unusual punishment.   (*Id*. at 18, 19.)

---

[1] The court notes that it has relied upon plaintiff's further characterization of the claims in his motion for summary judgment (#34), which helped clarify the unfocused Amended Complaint.  The court has, as required, liberally construed the Amended Complaint.  *See Hebbe v. Pliler*, 627 F.3d 338, 341-42 (9th Cir. 2010).

[2] In his summary judgment motion (#34), plaintiff identifies one of these Doe defendants as Nancy Flores.

Count II is more difficult to interpret. Plaintiff alleges violations of his Eighth and Fourteenth Amendment rights, and also his protection from discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132 ("Title II"), and also the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"). (*Id.* at 33.) Plaintiff does not identify any particular defendants in these claims; therefore, the court believes he intends to bring these claims against all defendants for their various actions that led to his presence at HDSP. The Eighth Amendment claim appears identical to the claim described in Count I.

As to the Fourteenth Amendment, plaintiff raises allegations of equal protection and due violations by the failures of NDOC and prison officials to follow applicable regulations. (*Id.* at 35-36.) The equal protection claim is nearly unintelligible, as the Amended Complaint provides no factual details even hinting at unlawful, class-based discrimination. The court assumes, in light of plaintiff's repeated references to "disparate impact," that plaintiff's theory is that he suffered unconstitutional discrimination at the hand of defendants due to the impact of the transfer and resulting HDSP conditions upon him, a person with alleged disabilities. As to due process, plaintiff seems to indicate that SDCC officials violated his rights during the decision making process that led to his transfer to HDSP (*See id.* at 34), which thereby duplicates the Fourteenth Amendment claims described in Count I.

Regarding Count II's ADA and Rehabilitation Act claims, plaintiff alleges that he is an "individual with a disability." (*Id.*) He points to his various NDOC medical classifications as evidence of his disabled status. (*See id*. at 33-34.) Although the exact theory is somewhat unclear, plaintiff seemingly avers that the decision to transfer him to HDSP disparately impacted him, in violation of the statutes. He alleges that serving the sentence at HDSP was more difficult for him than it would have been for a person without his disabilities, which rendered more difficult his

access to the recreational yard, medical services, showers, and caseworkers. (*Id*. at 34-35.) In addition, plaintiff alleges that he was denied the specific benefits of a lower-tier cell, a lower bunk, and a flat yard. (*Id*.)

As with the first two counts, Count III alleges violations of the Eighth and Fourteenth Amendments. (*Id*. at 38.) It appears plaintiff directs these claims against Kanouff, Griggs, defendants who served on the SDCC Classification Committee, and those defendants who prevented him from appealing the underlying disciplinary convictions. The due process violation differs from Count I: here, plaintiff challenges the alleged procedural deficiencies in the disciplinary hearing, including lack of notice and written decision, and his inability to call witnesses. (*Id*. at 39-45.) Additionally, defendants precluded him from pursuing an appeal by failing to provide him a written decision. (*Id*. at 45-49.) Plaintiff further avers that these actions infringed upon his Equal Protection and Eighth Amendment rights, but he does not articulate exact theories.

## II.    RESCREENING

### A.    Legal Standard

Federal courts conduct a preliminary screening in civil rights cases related to prison conditions. *See* 28 U.S.C. § 1915A(a). Screening identifies cognizable claims and dismisses all claims that are frivolous, malicious, or fail to state claims upon which relief may be granted. *Id*. §§ 1915A(b)(1)-(2). The court applies the Federal Rule 12(b)(6) dismissal standard when screening complaints. *Hamilton v. Brown*, 630 F.3d 889, 892-93 (9th Cir. 2011). Thereunder, each claim must be supported by sufficient factual allegations to make the claim "plausible on its face[,]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)), and also have basis in a cognizable legal theory, *Chubb Custom Ins. Co. v. Space Systems/Loral Inc.*, 710 F.3d 946, 956 (9th Cir. 2013).

As this District recently held in a well-reasoned opinion, federal courts do not ordinarily rescreen amended complaints, but they may do so at their discretion on a case-by-case basis. *Olausen v. Murguia*, No. 3:13-cv-00388-MMD-VPC, 2014 WL 6065622, at *5 (D. Nev. Nov. 12, 2014).   As this District has also explained, any claims or theories that have not been specifically dismissed via screening are to be considered at the summary judgment stage, even if the screening order does not explicitly address each theory or claim.  *See McDowell v. Rimington*, No. 3:12-cv-00249-MMD-WGC, 2013 WL 5316455, at *2 (D. Nev. Sept. 23, 2013).   In sum, the barest of allegations and claims in an amended complaint survive to the summary judgment stage, unless the court conducts a subsequent rescreening or defendants oppose, and prevail, plaintiff's motion to amend.

**B.    Analysis**

It is plain that the Amended Complaint has several substantial differences from the original Complaint, including some new legal theories.  The court, therefore, exercises its discretion to screen the Amended Complaint prior to considering the summary judgment motions.  For the following reason, the court recommends dismissal without leave to amend of the following claims: the below-described Eighth Amendment theory in Count I; any and all equal protection claims in Counts II and III; the due process claim in Count II; and the Eighth Amendment claim in Count III.

First, Count I states at least one Eighth Amendment theory that is not legally cognizable. Plaintiff's claim is that the very fact of his purportedly undeserved 251 days in disciplinary segregation subjected him to cruel and unusual punishment.   The argument fundamentally miscomprehends the Eighth Amendment.  The canon of Eighth Amendment authority confirms that the aim of that provision is not to protect against the very fact of punishment, but instead, to proscribe certain kinds of punishment so severe and brutal that they serve no legitimate penological

purpose and offend "any standard of human dignity."  *United States v. Bailey*, 444 U.S. 394, 423 (1980) (Blackmun, J., dissenting).  In other words, a contention that punishment is unwarranted speaks not to the Eighth Amendment, but rather to the due process guarantees of the Fourteenth. Moreover, as the court explains in part IV of this opinion, *infra*, all days that plaintiff remained in segregation beyond his sentence were on an administrative basis.  Ninth Circuit precedent rejects the notion that administrative segregation, in itself, is cruel and unusual punishment.  *Anderson v. Cnty. of Kern*, 45 F.3d 1310, 1315-16 (9th Cir. 1995).

Second, Counts II and III state no cognizable claims under the Equal Protection Clause. "The Equal Protection Clause requires the State to treat all similarly situated people equally." *Shakur v. Schriro*, 514 F.3d 878, 891 (9th Cir. 2008) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).  "To state a claim for violation of the Equal Protection Clause, a plaintiff must show that the defendant acted with an intent or purpose to discriminate against him based upon his membership in a protected class."  *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003).  For the purposes of an Equal Protection claim, intentional discrimination does not include "disparate impact" liability; instead, the plaintiff must prove "'that a defendant acted at least in part *because of* a plaintiff's protected status.'"  *Id.* (citing *Maynard v. City of San Jose*, 37 F.3d 1396, 1404 (9th Cir. 1994) (emphasis original).

Therefore, Count II equal protection claims are not legally cognizable.  Plaintiff does not allege defendants transferred plaintiff to HDSP *because of* his alleged disabilities, but instead, in ignorance to them.  To the extent that the Count III intends to allege an equal protection violation, plaintiff has offered only the barest of allegations—indeed, the mere phrase "equal protection." He articulates no facts that speak to the elements of such claims.  Therefore, the claims are legally insufficient.  *Iqbal*, 556 U.S. at 678.

Finally, the due process in Count II, and the Eighth Amendment violations in Counts II and III, are threadbare or duplicative.[3]  The claims lack almost entirely in factual detail and sufficient development, such that the court can determine, even under a generous standard, that cognizable claims exist.  Accordingly, and once again, these claims are insufficiently plead.  *Id.*

Therefore, the court recommends that only the following actions proceed to the summary judgment stage: Count I's Fourteenth Amendment due process claims, which concern the 251 additional days in disciplinary segregation; Count I's Eighth Amendment deliberate indifference claims; Count II's ADA and Rehabilitation Act claims; and Count III's due process claims, regarding the alleged procedural deficiencies in the January 2010 disciplinary hearing.

### III.    SUMMARY JUDGMENT LEGAL STANDARD

Summary judgment allows the court to avoid unneeded trials.  *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).  The court properly grants summary judgment when the record discovered by the parties demonstrates that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986).  "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49 (1986).  A dispute is "genuine" only where a reasonable jury could find for the nonmoving party.  *Id.*  Therefore, conclusory statements, speculative opinions, pleading allegations, or other assertions uncorroborated by facts are insufficient to establish a genuine dispute.  *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th Cir. 1996).  At this stage, the court's role is to verify that reasonable minds could differ when

---

[3] As described in Part I of this Report and Recommendation, Count II contains an Eighth Amendment claim that is identical to the claim in Count I.

interpreting the record; the court does not weigh the evidence or determine its truth.  *See Schmidt v. Contra Costa Cnty.*, 693 F.3d 1122, 1132 (9th Cir. 2012); *Nw. Motorcycle Ass'n*, 18 F.3d at 1472.

Summary judgment proceeds in burden-shifting steps.  Where the parties file cross-motions for summary judgment, the court considers each party's evidence in separate determinations, *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 960 (9th Cir. 2011), as the required showings for the parties vary by the ultimate burden of proof.  When the moving party bears the burden of proof at trial, it must support its motion "with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial."  *C.A.R. Transp.  Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal quotation omitted).  By contrast, a moving party who does not bear the burden of proof "need only prove that there is an absence of evidence to support the non-moving party's case[,]" *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010), and such a party may additionally produce evidence that negates an essential element of the nonmoving party's claim or defense, *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  Ultimately, the moving party must demonstrate, on the basis of authenticated evidence, that the record forecloses the possibility of a reasonable jury finding in favor of the nonmoving party as to disputed material facts.  *Celotex*, 477 U.S. at 323; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).  The court views all evidence and any inferences arising therefrom in the light most favorable to the nonmoving party.  *Colwell v. Bannister*, 763 F.3d 1060, 1065 (9th Cir. 2014).

Where the moving party meets its burden, the nonmoving party must "designate specific facts demonstrating the existence of genuine issues for trial.  This burden is not a light one."  *In re Oracle Corp.*, 627 F.3d at 387 (internal citation omitted).  "The non-moving party must show more than the mere existence of a scintilla of evidence. . . . In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor."

*Id.* (internal citations omitted).   The nonmoving party may defeat the summary judgment motion only by setting forth specific facts that illustrate a genuine dispute that requires a factfinder's resolution.   *Liberty Lobby*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324.   Although the nonmoving party need not produce authenticated evidence, Fed. R. Civ. P. 56(c), mere assertions, pleading allegations, and "metaphysical doubt as to the material facts" will not defeat a properly-supported and meritorious summary judgment motion, *Orr*, 285 F.3d at 783.

## IV.    DISCUSSION

For the reasons herein described, the court recommends that defendants' motion be granted as to all counts, and plaintiff's motion be denied in its entirety.   First, the court considers the due process claims in Counts I and III.   Second, the court turns to Count I's Eighth Amendment claims.   Finally, the court examines Count II's statutory disability claims.   Within each of these separate areas, the court addresses, separately, each summary judgment motion.   *Johnson*, 658 F.3d at 960.

## A.    Civil Rights Claims Under § 1983

42 U.S.C. § 1983 aims "to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights."   *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006) (quoting *McDade v. West*, 223 F.3d 1135, 1139 (9th Cir. 2000)).   The statute "provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights[,]" *Conn v. Gabbert*, 526 U.S. 286, 290 (1999), and is "merely . . . the procedural device for enforcing substantive provisions of the Constitution and federal statutes," *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).   Claims under § 1983 require the plaintiff to allege (1) the violation of a federally-protected right by (2) a person or official who acts under the color of state law.   *Warner*, 451 F.3d at 1067.   Further, to prevail on a § 1983 claim, the plaintiff

must establish each of the elements required to prove an infringement of the underlying constitutional or statutory right.

**B.      Fourteenth Amendment Claims**

Fourteenth Amendment claims for denial of procedural due process entail two components. First, the court must determine that the plaintiff possessed a constitutionally protected interest, such that due process protections apply.   Second, and if so, the court must examine the level of due process demanded under the circumstances.   A claim lies only where the plaintiff has a protected interest, and the defendant's procedure was constitutionally inadequate.

**1.      Protected Liberty Interests**

The Fourteenth Amendment of the U.S. Constitution guarantees all citizens, including inmates, due process of law.   However, the Constitution protects only certain interests with the guarantees of due process; an inmate's right to procedural due process arises only when a constitutionally protected liberty or property interest is at stake.   *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).   Such interests may arise from the Constitution itself or from state law.

Under the Due Process Clause, an inmate does not have liberty interests related to prison officials' actions that fall within "the normal limits or range of custody which the conviction has authorized the State to impose."   *Sandin v. Conner*, 515 U.S. 472, 478 (1995) (citing *Meachum v. Fano*, 427 U.S. 215, 225 (1976)).   The Clause contains no embedded right of an inmate to remain in a prison's general population.   *Id*. at 485-86.   Further, "the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence."   *Hewitt v. Helms*, 459 U.S. 460, 468 (1983), *overruled on other grounds by Sandin*, 515 U.S. at 472-73.   "Thus, the hardship associated with administrative segregation, such as loss of recreational and rehabilitative programs or confinement to one's cell for

a lengthy period of time, does not violate the due process clause because there is no liberty interest in remaining in the general population." *Cnty. of Kern*, 45 F.3d at 1315.  At bottom, "[o]nly the most extreme change in conditions of confinement have been found to directly invoke the protections of the Due Process Clause . . . ." *Chappell v. Mandeville*, 706 F.3d 1052, 1063 (9th Cir. 2013); *see also Kirk v. Foster*, No. 3:13-cv-00296-RCJ-WGC, 2014 WL 6792028, at *13 (D. Nev. Dec. 1, 2014) (collecting cases).

State law also may create liberty interests.  Where segregated housing or other prison sanctions "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life[,]" due process protections arise.  *Sandin*, 515 U.S. at 483-84.  What matters is not the particular label or characterization of the segregation or sanction, but instead, its underlying nature: "[n]o matter how a prisoner's segregation (or other deprivation) is labeled by the prison or characterized by the prisoner, a court must examine the substance of the alleged deprivation and determine whether it constitutes an atypical and significant hardship . . . ." *Hernandez v. Cox*, 989 F. Supp. 2d 1062, 1068-69 (D. Nev. 2013).

When conducting the atypical-hardship inquiry, courts examine a "combination of conditions or factors . . . ." *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996).  These include: (1) the extent of difference between segregation and general population; (2) the duration of confinement; and (3) whether the sanction extends the length of the prisoner's sentence.  *See Serrano*, 345 F.3d at 1078 (citing and discussing *Sandin*, 515 U.S. at 486-87). That a particular punishment or housing placement is more restrictive than administrative segregation or general population privileges is, alone, not enough: even where "the conditions in segregation are worse than those a prisoner will typically encounter in prison, the Court must still consider whether the conditions are extreme enough in nature and duration or whether they will necessarily affect the length of a prisoner's

sentence." *Hernandez*, 989 F. Supp. 2d at 1069.  In addition, the Supreme Court has held that the loss of prospective work and good-time credits that ultimately may effect an earlier release from incarceration is "too attenuated" to support an atypical hardship finding under the third factor.  *See Sandin*, 515 U.S. at 487.

On several occasions, courts have applied the *Sandin* factors to segregated confinement, of both the administrative and disciplinary varieties.  Although one court in this District has held that placement in administrative segregation following a disciplinary sentence may constitute atypical hardship, *see Parra v. Skolnik*, No. 3:11-cv-00913-LRH-WGC, 2013 WL 5428473, at *8-9 (D. Nev. July 1, 2013), the weight of authority reaches the contrary conclusion.  "Typically," as the Ninth Circuit has stated, "administrative segregation in and of itself does not implicate a protected liberty interest" under the *Sandin* factors.  *Serrano*, 345 F.3d at 1078.  As to disciplinary segregation, the Ninth Circuit has remarked that "it would be difficult . . . to make disciplinary segregation sufficiently more restrictive than the conditions of general population . . . to count as an atypical and significant deprivation of liberty . . . ."  *Id.*  Only where the terms of disciplinary confinement are extreme—for example, indefinite solitary confinement that necessarily entails the loss of parole eligibility—have most courts found that liberty interests might arise.  *E.g.*, *Wilkinson*, 545 U.S. at 224; *Brown v. Ore. Dep't of Corrs.*, 751 F.3d 983, 988 (9th Cir. 2014).

## 2.    Requirements of Due Process

Upon concluding that a protected liberty or property interest is at stake, the court then considers whether prison officials have adhered to the due process requirements.  "[A] prisoner is not wholly stripped of constitutional protections when he is imprisoned for a crime . . . ."  *Wolff v. McDonnell*, 418 U.S. 539, 555 (1974).  In prison disciplinary proceedings,

> due process requires that the inmate receive: (1) written notice of charges; (2) at least twenty-four (24) hours between the time the prisoner receives the written notice and

the time of the hearing, so that the prisoner may prepare his defense; (3) a written statement by the hearing officer of the evidence relied upon and the reasons for taking disciplinary action; (4) the right of the prisoner to call witnesses in his defense, when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals; and (5) legal assistance if the prisoner is illiterate or the issues presented are legally complex.

*Kirk*, 2014 WL 6792028, at *15 (citing *Wolff*, 418 U.S. at 564-71).  The inmate's rights are not unfettered; due process protections must accommodate the prison's legitimate institutional needs. *Bostic v. Carlson*, 884 F.2d 1267, 1269-70 (9th Cir. 1989) (citing *Superintendent v. Hill*, 472 U.S. 445, 454-55 (1985)); *Koenig v. Vannelli*, 971 F.2d 422, 423 (9th Cir. 1992) ("When prison official's limit an inmate's efforts to defend himself, they must have a legitimate penological reason.").

Additionally, the hearing officer's decision must be based upon "some" evidence.  *Castro v. Terhune*, 712 F.3d 1304, 1307 (9th Cir. 2013) (citing *Hill*, 472 U.S. at 455).  The showing required by this standard is "minimally stringent," *Id.* at 1314 (quoting *Powell v. Gomez*, 33 F.3d 39, 40 (9th Cir. 1994)), and the court is not to "examine the entire record, independently assess witness credibility, or reweigh the evidence," *Id.* (citing *Bruce v. Yist*, 351 F.3d 1283, 1287 (9th Cir. 2003)). Stated differently, as long as prison officials relied on some evidence, the court shall not substitute its view of the facts under the guise of scrutinizing procedure;  the court is limited to verifying that the decision had some basis, even if the court might reach a contrary determination had it been presented with the evidence in the first instance.

In contrast to due process requirements for disciplinary sentences, the decision to hold an inmate in administrative segregation entails fewer procedural requirements.   Although "administrative segregation may not be used as a pretext for indefinite confinement of an inmate[,]" prison officials provide adequate due process—whether or not it is constitutionally demanded—by holding an informal, non-adversarial evidentiary hearing within a reasonable time after administrative segregation begins, with periodic reviews thereafter, to verify that continuing reasons

support the segregation decision.  *See Hewitt*, 459 U.S. at 477 & n. 9.  The Ninth Circuit has deemed review every 120 days as sufficiently reasonable under this standard.  *Toussaint v. McCarthy*, 926 F.3d 800, 803 (9th Cir. 1990).

Prison officials need not adhere to anything more but these requirements to provide due process.  Therefore, a prison's failure to honor the procedural steps of more expansive disciplinary or administrative hearing regimes is not necessarily a constitutional infirmity.  As this District has observed, "[t]he Supreme Court . . . has emphatically rejected the proposition that a violation of state corrections department regulations gives rise to a liberty interest protected by the Due Process Clause . . ." and, therefore, "alleged procedural irregularities in prison disciplinary proceedings do not give rise to a viable constitutional procedural due process claim in and of themselves."  *Turner v. Grievance Coordinator*, No. 2:13-CV-02126-APG, 2014 WL 3002082, at *2 (D. Nev. June 30, 2014).  Stated differently, prison officials do not offend the Constitution by ignoring prison hearing regulations; for the purposes of § 1983, they need only respect the directives of *Wolff*.

**3.     Analysis**

**a.     Defendants' Motion for Summary Judgment**

**i.     Count I**

The court first considers Count I's Fourteenth Amendment claims, which pertain to the 251 "extra" days of disciplinary segregation.  As the court explains below, defendants did not impose upon plaintiff any excessive days in disciplinary segregation; plaintiff remained in segregation past the expiration date on an administrative basis.  Accordingly, the question is whether plaintiff had a liberty interest in his administrative segregation.  The court concludes that defendants are entitled to summary judgment for two reasons.  First, defendants have adduced undisputed evidence that

establishes plaintiff lacked a liberty interest in such placement.  Second, and in the alternative, defendants provided adequate due process.

Defendants have submitted evidence that establishes, contrary to plaintiff's view, that they did not impose upon him 251 additional days of disciplinary segregation.  In contrast, he was reclassified to administrative segregation and held therein until suitable general population housing became available at WSCC.  On January 11, 2010, Griggs found plaintiff guilty of two disciplinary violations: extortion, and unauthorized use of mail.  (#44-1 at 4-6.)  On the same day, he began serving two consecutive sentences of disciplinary segregation: 730 days for the extortion charge, and sixty days for the mail charge.  (*Id*. at 5; #44-4 at 2.)  Therefore, as of January 11, 2010, plaintiff's disciplinary segregation sentence was to expire on March 11, 2012—that is, 790 days thereafter.

To incentivize and reward good behavior, the NDOC credits inmates serving certain disciplinary sentences with "good-time" credits that shorten a segregation sentence.  Pursuant to NDOC Administrative Regulation 707.05, an inmate receives a thirty-day credit for each ninety-day period in which the inmate has not been convicted of a general or major disciplinary violation, as long as the disciplinary sentence is lengthier than three months.  (#44-5 at 21.)  Accordingly, plaintiff's extortion charge, but not his mail charge, was eligible for length reduction.  (*See id*.)  Commendably, plaintiff earned several such credits during his stay in segregation.  On April 11, 2010, plaintiff received a thirty-day credit.  (#44-2 at 4; #44-3 at 4; #44-4 at 2 (stating, as of May 6, 2010, that plaintiff's expiration date was February 10, 2012).)  Plaintiff received a second thirty-day reduction in his segregation time on July 11, 2010, thereby moving his expiration date to January 11, 2012.  (#44-2 at 4; #44-3 at 4.)

However, plaintiff pled guilty to a disciplinary violation on August 30, 2010.  (#44-7 at 2-7.)  For the violation, he received a suspended sentence of thirty days.  (*Id*. at 6.)  Under NDOC policy,

"sanctions that have been suspended may be imposed upon a finding of guilty on another disciplinary charge within the probationary period." (#44-5 at 21.) Hence, this violation did not immediately extend plaintiff's disciplinary sentence, but it would do so upon another infraction on his part. Plaintiff then pled guilty to another infraction on September 18, 2010. (#44-6 at 2-3.) As such, as of September 18, 2010, his expiration date moved to February 10, 2012. His eligibility for another good-time reduction required ninety days of infraction-free conduct beginning after that date. (*See* #44-2 at 4; #44-3 at 4.)

Plaintiff completed three consecutive ninety-day periods without disciplinary infractions. Accordingly, on December 17, 2010, March 17, 2011, and June 17, 2011, plaintiff received thirty-day credits. (#44-2 at 4; #44-3 at 4; #44-4 at 3.) As of June 17, his disciplinary segregation was to expire on November 12, 2011. At the next ninety-day review, on September 17, 2011, plaintiff received a final thirty-day credit. (#44-2 at 4; #44-3 at 4; #44-4 at 3.) Thus, plaintiff's disciplinary sentence would expire on October 13, 2011. Eight days later, on October 21, 2011, prison officials reclassified plaintiff to administrative segregation, where he was to be held pending transfer to general population elsewhere. He remained in segregation at HDSP until March 12, 2012.

Plaintiff's sole genuine challenge to this evidence, which establishes he was held in administrative segregation during the relevant time period, is his averment that he did not receive a classification committee review until his transfer to WSCC on March 23, 2011. (#70 at 2.) Yet evidence he produced in his opposition plainly reveals that he was, in fact, held in administrative segregation, and informed of such, while awaiting transfer to WSCC. (*See, e.g.*, #70 at 9, 28, 34.) Moreover, defendants' exhibits reveal that they did reclassify him to administrative segregation on October 21, 2011 (*E.g.* #44-8 at 2), even if he remained within the same cell. The delay in transferring plaintiff from the HDSP unit to WSCC owed specifically to the fact that one of his

identified enemies was present at that institution.  (#44-2 at 5; #44-3 at 5; #44-4 at 3 ("Previously approved for WSCC but now has a CMS [enemy] there."); #44-9 at 2 (evidencing plaintiff's request, while in disciplinary segregation, to add additional persons to his enemies list).)

Accordingly, the issue, as defendants have identified, is whether plaintiff had a liberty interest in avoiding administrative segregation between October 13, 2011 and March 12, 2012. Defendants argue that no issue of fact remains on this point, and plaintiff will be unable to establish a liberty interest.  (#44 at 12-13.)  Although plaintiff alleged in his amended complaint that disciplinary segregation—and, presumably, administrative segregation, as he maintains he was kept in the same housing unit—was "significantly more restrictive," (#32 at 17-18), his opposition does not contest defendants' argument that he lacks evidence on this point.  (*See generally* #70 at 1-6.) Moreover, even had plaintiff designated specific facts that speak to the *Sandin* factors, the court is mindful that precedent cautions against finding atypical hardship for both disciplinary and administrative segregation.  *E.g., Serrano*, 345 F.3d at 1078.  In particular, the court is persuaded by this District's holding, on a prior occasion, that an inmate held in administrative segregation as he awaited the availability of suitable housing in general population unit lacked an actionable due process claim.  *Garcia v. Burns*, 787 F. Supp. 948, 951 (D. Nev. 1992); *see also Grayson v. Rison*, 945 F.2d 1064 (9th Cir. 1991).  Because plaintiff, who shoulders the burden of proof on this point, has not designated facts from which a reasonable jury could find he has a liberty interest, defendants are entitled to summary judgment.

On an alternative basis, the court concludes that defendants provided to plaintiff all process that was due during administrative segregation.  Plaintiff was held in administrative segregation for the sole purpose of finding suitable, post-segregation housing at a prison appropriate for his security classification, various restrictions, and also in which he did not have enemies.  (#44-2 at 4-5; #44-3

at 4-5; #44-4 at 3; #44-8 at 2.)  As soon as an identified enemy had been transferred from WSCC to another prison, defendants transferred plaintiff to WSCC.  (#44-2 at 6; #44-3 at 5.)  Between October 13, 2011 and March 12, 2011, defendants periodically reviewed plaintiff's transfer status. (#44-2 at 4-5; #44-3 at 4-5; #44-4 at 3; #44-8 at 2.)  Such hearings or reviews occurred, whether or not plaintiff was present, on October 21, 2011; November 4, 2011, December 2, 2011, February 3, 2012, and March 15, 2012.  (#44-4 at 3.)  Under Ninth Circuit precedent, nothing more was required. *Hewitt*, 459 U.S. at 477 & n. 9; *Toussaint*, 926 F.3d at 803.

Plaintiff's attempt to demonstrate that a factual issue remains is unavailing.  He argues that he "did not receive any classification committee review of his [administrative] segregation status until his transfer to [WSCC] on March 23, 2012." (#70 at 2.)  For support, he cites to his own affidavit, filed in support of his summary judgment motion, in which he attests to the same.  (*See id.*; *see also* #34-3 at 4.)  Plaintiff's self-serving statement provides an insufficient basis from which a reasonable jury can find in his favor, in light of the documentary evidence defendants have presented.  At bottom, and in the alternative, the court recommends summary judgment on the basis that defendants indisputably provided all process that the Constitution demanded.

ii.     **Count III**

The court also recommends that defendants' motion be granted on the Count III due process claims, which pertain to the alleged procedural deficiencies in the January 2010 disciplinary hearing. Here, the court concludes that defendants provided to plaintiff any and all process that was due.[4]

First, plaintiff received a written notice of charges well in advance of his disciplinary hearing.  *Kirk*, 2014 WL 6792028, at *15.  Defendants have provided a copy of the written notice of

---

[4] Defendants have not argued that plaintiff lacked a state-created liberty interest in disciplinary segregation.  As such, the court considers summary judgment upon this ground alone.  The court expresses no opinion as to whether plaintiff possessed a liberty interest, such that *Wolff* and its progeny demanded due process.   For analysis, the interest is simply presumed.

charges, which bears plaintiff's signature and thereby acknowledges service and his receipt on December 14, 2009. (#44-1 at 2.) The disciplinary hearing in which Griggs considered the charges and found plaintiff guilty did not occur until January 11, 2010. (*Id*. at 3.) Accordingly, defendants satisfied the notice requirements.

Second, plaintiff received a written statement following the January disciplinary hearing that identified the evidence Griggs relied upon. *Kirk*, 2014 WL 6792028, at *15. The statement particularly identifies as evidence Roehm's investigation report. (#44-1 at 4.) Defendants have provided an audio recording of the disciplinary hearing, in which plaintiff verbally confirms that he possessed a copy of the investigative report. (#48-1 at 3:35-45.) As with the notice of charges, the decision statement bears plaintiff's signature, thereby acknowledging his receipt. (#44-1 at 6.)

Finally, plaintiff was provided an opportunity to call witnesses. *Kirk*, 2014 WL 6792028, at *15. As established beyond dispute by the recording, plaintiff voluntarily declined this opportunity. (#48-1 at 8:24-29.) Accordingly, and once again, no reasonable jury will be able to find, in light of this evidence, that plaintiff's averment is true.

In sum, plaintiff's contention that he did not receive these procedural protections (#32 at 40) is wholly unavailing. So, too, is his contention that he unable to appeal the decision because he was not provided a copy of the decision (*Id*. at 46), and, in light of the audio recording, his allegation that Griggs relied on evidence outside the record (*Id*. at 43). Although not litigated by the parties, the court observes that Griggs's reliance on the report satisfies the minimally stringent "some evidence" requirement. *Castro*, 712 F.3d at 1307. To the extent that plaintiff alleges any other violations of NDOC procedural steps, the position lacks merit. *See Turner*, 2014 WL 3002082, at *2. Because defendants have demonstrated that no genuine factual dispute remains as to the sufficient due process that they provided, they are entitled to summary judgment on Count III's due process claims.

**b.      Plaintiff's Motion for Summary Judgment**

The court recommends that plaintiff's motion for summary judgment be denied.  First, he has failed to demonstrate that he has a liberty interest in his placement in disciplinary segregation, as required in Counts I[5] and III.  Second, his motion offers no arguments or evidence regarding the Count III due process claims.

Plaintiff's motion fails entirely to articulate arguments regarding his liberty interest in disciplinary segregation under the applicable *Sandin* factors.  Nevertheless, the court takes notice of his affidavit, in which he makes several statements pertaining to the conditions of disciplinary segregation.  Specifically, plaintiff states that disciplinary segregation is "substantially more restrictive than administrative segregation housing."  He cites only two differences.  First, inmates in disciplinary segregation may make only one fifteen-minute phone call per month, while inmates in administrative segregation may make one such call per day.  (#34-3 at 6.)  Second, inmates in disciplinary segregation may spend only $25 per week at the canteen, while inmates in administrative segregation may spend up to $75 on a broader variety of items.  (*Id.*)  The more substantial alleged differences in the amended complaint (*see* #32 at 26) are, therefore, unsupported by any evidence whatsoever.

Accordingly, the court concludes that plaintiff has failed to demonstrate that disciplinary segregation imposed upon him atypical hardship under the first *Sandin* factor.  *Serrano*, 345 F.3d at 1078.  In short, the loss of more expansive telephone and canteen privileges can hardly be said to be significant.  Plaintiff advances no argument and offers no evidence as to the second and third *Sandin* factors, by which the court could conclude a hardship arose due to the duration or increased length of

---

[5] As described, the record conclusively demonstrates that plaintiff  was reclassified to administrative segregation at the proper time.  Therefore, plaintiff's errs in his conclusion that he remained in disciplinary segregation.  The court, nevertheless, considers his motion by its own terms and upon its own evidence.  *Johnson*, 658 F.3d at 960.

incarceration.  The court acknowledges that plaintiff's amended complaint alleges the loss of work credits, which may have ultimately reduced the length of his sentence.  (#32 at 26.)  Yet the Supreme Court has dismissed the loss of such credits as "too attenuated" to support a hardship finding.  *See Sandin*, 515 U.S. at 487.  Accordingly, plaintiff has failed to establish disciplinary segregation created a liberty interest under *Sandin*; therefore, his due process claims in Counts I and III necessarily fail.

The court also concludes that, as to Count III, plaintiff has not met his Rule 56 burden.  His motion omits any discussion and makes no arguments regarding the alleged procedural deficiencies at his hearing on which that Count rests.  (*See* #34.)   Because he has not offered arguments—let alone evidence—that establishes, beyond dispute, that defendants violated due process requirements applicable to the January 2010 disciplinary hearing, he is not entitled to summary judgment.  The court recommends his motion be denied on these bases.

## C.   Eighth Amendment Claims

The Eighth Amendment "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency" by prohibiting imposition of cruel and unusual punishment by state actors.  *Estelle v. Gamble*, 429 U.S. 97, 102 (1976).  The Constitution's stricture on the "unnecessary and wanton infliction of pain" encompasses deliberate indifference by state officials to the medical needs of prisoners.  *Id.* at 104.  It is well-settled law that "deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983."  *Id.* at 105.

In the Ninth Circuit, deliberate indifference claims are analyzed under a two-part test.  "In order to prevail on an Eighth Amendment claim for inadequate medical care, a plaintiff must show . . . an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference."  *Colwell*, 763 F.3d at 1066

(quoting *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012)) (internal citations and quotation marks omitted).  The objective component examines whether the plaintiff has a "serious medical need," such that the state's failure to provide treatment could result in further injury or cause unnecessary and wanton infliction of pain.  *Jett v. Penner*, 439 F.3d 1090, 1096 (9th Cir. 2006).  Serious medical needs are those "that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities' or the existence of chronic and substantial pain."  *Colwell*, 763 F.3d at 1066 (citation and internal punctuation omitted).

The subjective element considers the defendant's state of mind and whether the plaintiff was harmed.  Only where a prison "official 'knows of and disregards an excessive risk to inmate health and safety'" is the subjective element of the test satisfied.  *Id.* (quoting *Toguchi v. Chung*, 391 F.3d 1050, 1057 (9th Cir. 2004)).  The conduct must consist of "more than ordinary lack of due care." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).  Not only must the defendant prison official have actual knowledge from which he or she can infer that a substantial risk of harm exists, but he or she "must also draw that inference."  *Id.* at 837.  The standard lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other[,]" *id.* at 836, and does not include "accidental or unintentional failures to provide adequate medical care . . . ," *Estelle*, 429 U.S. at 105.  Finally, the plaintiff must prove that he was harmed by the indifferent actions, though the harm need not be substantial.  *Jett*, 439 F.3d at 1096.

## 1.  Defendants' Motion for Summary Judgment

The court recommends that defendants' motion on the Eighth Amendment claims be granted.  Defendants argue that plaintiff will be unable to establish that any defendant subjectively disregarded a risk to plaintiff's medical conditions, and, further, that serving his sentence at HDSP

exposed him to a substantial risk of harm.  (#44 at 18-19.)   The court agrees that plaintiff has articulated only allegations that the conditions of HDSP posed substantial risks of harm (*see, e.g.,* #32 at 19-20) without identifying any specific risks, other than the navigation of stairs and use of manacle restraints (*Id*. at 35-36).   Yet the court principally recommends summary judgment on another basis: plaintiff has not alleged, and therefore will be unable to prove, that he was harmed by his placement at HDSP.

Deliberate indifference claims require that the plaintiff allege and prove that he suffered harm from the defendants' actions.  *Jett*, 439 F.3d at 1096.   In this case, plaintiff essentially concedes that he was unharmed.  His amended complaint states that the conditions "*threatened* to exacerbate his injuries . . . ."  (#32 at 20.)  He repeatedly alleges *potential* risks or exposures from the stairs, bunk, the difficulties of travailing the HDSP terrain, and the like (*e.g.*, *id.* at 35), yet the gravamen of the amended complaint is that he complained about these facts to defendants and they took no action.  (*Id*.)  He does not allege that he suffered harm by, for example, falling down the stairs or out of the top-tier bunk.  Absent any allegations and proof of harm, defendants are entitled to summary judgment.

Assuming that his allegations of "pain and suffering" caused by the manacle restraints (*Id*. at 36) is a sufficient allegation of harm, defendants remain entitled to summary judgment.  He has alleged merely that he has various "medical restrictions," but these are insufficient to establish the objective element of the claim.  That he may have one or another restriction in his type of housing is not, in itself, a "serious medical need" that requires any type of treatment.  *Jett*, 439 F.3d at 1096; *Colwell*, 763 F.3d at 1066.  Further, even if it was, the use of restraints, without greater factual allegations and evidence, did not constitute an "excessive risk."  Accordingly, plaintiff's claims will necessarily fail, as reasonable jury will be unable to find facts from which defendants will be liable.

### 2. Plaintiff's Motion for Summary Judgment

The court recommends that plaintiff's motion be denied.  First, the court concludes that plaintiff's claims will fail for the same reasons identified above.  Second, plaintiff's motion makes no argument and presents no evidence to support his entitlement to summary judgment on the Eighth Amendment claims.  The portion of his brief that discusses Count II offers arguments only about that Count's ADA claim.  (*See* #34-1 at 36-47.)

### D. ADA and Rehabilitation Act Claims

### 1. Title II of the ADA

The Americans with Disabilities Act ("ADA") and the Rehabilitation Act each apply in the prison context to prohibit discrimination against inmates with disabilities. *See United States v. Georgia*, 546 U.S. 151, 154 (2006); *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998).  To prove an ADA Title II claim, the inmate must establish that:

> (1) he is an individual with a disability; (2) he is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) he was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of his disability.

*O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1060 (9th Cir. 2007) (citation, quotation marks, and punctuation omitted).

At the summary judgment stage, a plaintiff does not establish the first element, "disability," by merely alleging that he is an "individual with a disability" or proving that he has some particular physical or medical condition.  Under the ADA, disability is a multi-faceted legal determination.  42 U.S.C. § 12102 sets forth the definition of disability applicable to each of the ADA's sections.  *See Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 201 (2002) (internal citations omitted), *superseded on other grounds by statute*, ADA Amendments Act of 2008, Pub. L. No. 110–325, 122

Stat. 3553 (2008).   Under the Act's definition, the plaintiff must prove he has (1) a mental or physical impairment that (2) substantially limits (3) a major life activity.  42 U.S.C. § 12102(1)(A). Alternatively, he may show disability by proving the relevant actors perceived that he had a mental or physical impairment and acted upon that basis, *id.* §§ 12102(1)(C), 12102(3)(A)-(B), or by establishing that he has a record of an impairment that substantially limits a major life activity, *id.* § 12102(1)(B).

The term "discrimination" under the ADA is broad, and thereby requires affirmative obligations not present in other civil rights statutes.  Because the ADA "was premised on Congress's finding that discrimination against the disabled is 'most often the product, not of invidious animus, but rather of thoughtlessness and indifference,'" discrimination under the Act "does not extend only to obviously exclusionary conduct . . . ," but also to "more subtle forms of discrimination . . . that interfere with disabled individuals' 'full and equal enjoyment'" of public services.  *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 944-45 (9th Cir. 2011) (quoting *Alexander v. Choate*, 469 U.S. 287, 295-96 (1985) and 42 U.S.C. § 12182(a)).  This includes two distinct, but similar, forms of discrimination: disparate impact, and the failure to make reasonable accommodations.  *See McGary v. City of Portland*, 386 F.3d 1259, 1265-66 (9th Cir. 2004).  Courts are to take care not to conflate these claims and apply the standards of one to the others.  *See id.*

A plaintiff alleges disparate impact under Title II by identifying a facially neutral policy or decision that, because of his disability, effectively precludes him from "meaningful access" to a public service.  *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1102 (9th Cir. 2013). "[D]isparate impact discrimination arises from actions that discriminate only in 'effect' rather than 'design[,]'" *Mark H. v. Lemahieu*, 513 F.3d 922, 936 (9th Cir. 2008); therefore, to survive summary judgment on a disparate impact claim, the plaintiff must adduce some evidence—typically

statistical—that the effect of such a policy or decision more harshly impacts a *group* of disabled persons than it does to a relevant comparison group.  *See Lopez v. Pac. Maritime Ass'n*, 657 F.3d 762, 767 (9th Cir. 2011) (citing *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308 (1977)).

By contrast, a plaintiff may also bring a failure-to-accommodate claim under Title II.  There, the plaintiff alleges that a governed entity failed to make reasonable modifications in policies, practices, or procedures, and as a result, the plaintiff, individually, was unable to partake in the public entity's programs, services, or activities.  *McGary*, 386 F.3d at 1266.  Liability arises where no accommodation occurs, unless accommodation would fundamentally alter the nature of the service, program, or activity.  28 C.F.R. § 35.130(b)(7); *Barden v. City of Sacramento*, 292 F.3d 1073, 1077 (9th Cir. 2002) (observing that courts are to accord deference to the Department of Justice's interpretations of the ADA, as codified in 28 C.F.R.).

## 2.  Rehabilitation Act § 504

Section 504 of the Rehabilitation Act, codified at 29 U.S.C. § 794, instructs that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  Claims under the Rehabilitation Act are similar to those brought pursuant to ADA Title II. *Vinson v. Thomas*, 288 F.3d 1145, 1152 n. 7 (9th Cir. 2002) (stating that "there is no significant difference in the analysis of rights and obligations created by the two Acts").  Under § 504, the plaintiff must establish that: "(1) he is an individual with a disability; (2) he is otherwise qualified to receive the benefit; (3) he was denied the benefits of the program solely by reason of his disability; and (4) the program receives federal financial assistance." *O'Guinn*, 502 F.3d at 1060 (citation and internal quotation omitted).

As with Title II claims, § 504 embraces both disparate impact and reasonable accommodation claims.  The scope of disparate impact liability is somewhat more limited; as the Ninth Circuit has observed, "while § 504 may prohibit some disparate impacts, it is not intended to prohibit *all* such impacts." *Lemahieu*, 513 F.3d at 936; *see also Choate*, 469 U.S. at 299 (rejecting the "boundless notion that all disparate-impact showings" are violations of § 504).  Only those impacts which amount to the denial of "meaningful access" are actionable as disparate impact claims.  *See Tustin Unified Sch. Dist.*, 725 F.3d at 1102; *Crowder v. Kitigawa*, 81 F.3d 1480, 1484 (9th Cir. 1996).  In addition, § 504 may require "reasonable modifications necessary to correct for instances in which qualified disabled people are prevented from enjoying meaningful access to a benefit because of their disability." *Lemahieu*, 513 F.3d at 937 (quoting *Se. Cmmy. Coll. v. Davis*, 442 U.S. 397, 410 (1979)) (internal quotation marks and emphasis omitted).  As with Title II, the claims are distinct.

**1.      Defendants' Motion for Summary Judgment**

The court recommends that defendants' motion be granted as to the ADA and Rehabilitation Act claims.  Defendants argue, correctly, that plaintiff cannot provide evidence to establish that he is an "individual with a disability" under the meaning of the ADA—and, by implication, under Rehabilitation Act.  (#44 at 20-22).  Therefore, the ADA provides no legal protections to plaintiff and the claims necessarily fail.

Plaintiff's opposition does not demonstrate genuine factual issues remain as to his disabled status.  He discusses only his "medical restrictions," but these are insufficient facts from which disability can be determined under the Act's tripartite inquiries.  *See O'Guinn*, 502 F.3d at 1060.  Plaintiff has not come forward with statements, much less evidence, of any specific impairments or major life activities substantially limited thereby.  (*See* #70 at 1-6.)  His conclusory statements about

his "medical disability" (*see id*. at 18, 20, 30-32, 34) cannot, therefore, create a genuine factual issue as to his disability status.  Accordingly, defendants are entitled to summary judgment on both claims.

Further, assuming *arguendo* that plaintiff could establish disability under the statutes, each claim would fail for other reasons.  First, plaintiff's allegations do not establish disparate-impact liability.  For sake of argument, the court accepts as true his allegations regarding defendants' decisions to house him during segregation in an upper-tier cell, in an upper bunk, at a prison that is neither a flat nor medical yard, and assumes that such actions are "facially neutral decisions."  Further assuming that he had adduced all necessary evidence to support his contention that these HDSP features rendered more difficult his access of various activities and programs while in segregation, he has not alleged that he was denied "meaningful access."  *Tustin Unified Sch. Dist*., 725 F.3d at 1102.  Rather, he simply complains that navigating stairs during his segregation periods was difficult.  This is insufficient to establish disparate impact liability under either Act.

Moreover, both claims speak only to his individual difficulties.  Disparate impact claims require anecdotal or statistical proof of the impact of a decision upon a group of similarly situated persons.  *See Lopez*, 657 F.3d at 767.  Although his allegations might speak to a failure of defendants to reasonably accommodate, he has not brought such claims.  In addition, the § 504 claims will fail because plaintiff has not alleged or designated as a factual issue that defendants receive federal funding, a threshold requirement of § 504.  *O'Guinn*, 502 F.3d at 1060.

## 2.    Plaintiff's Motion for Summary Judgment

The court recommends that plaintiff's motion be denied.  In short, his motion is insufficient under Rule 56 for the evidentiary reasons identified above; his motion is unsupported by evidence that speaks to the three elements of the disability inquiry under Title II and § 504.  Indeed, his motion rests upon his mistaken understanding that, because he has alleged disability, defendants

must come forward with evidence to disprove his allegations.  (*E.g.*, #34 at 38.)   The view is mistaken.  Because he has not demonstrated beyond dispute that he is disabled, he is not entitled to summary judgment.  The court recommends that his motion be denied.

## IV.    CONCLUSION

Based upon the foregoing, and for good cause appearing, the court concludes that defendants' motion should be granted on all claims, and plaintiff's motion should be denied.  There are no genuine factual issues in the Fourteenth Amendment claims.  Plaintiff will be unable to establish he had stated-created liberty interests in administrative segregation, or was denied due process during the January 2010 hearing or the October 2011 reclassification.  Likewise, no factual issues exist as to the Eighth Amendment claims.  Plaintiff will be unable to establish the required elements thereof because, at minimum, he was unharmed by his housing at HDSP.  Finally, no jury can find from the evidence that plaintiff is disabled under the requirements of the ADA and the Rehabilitation Act.  Even if so, the nature of his allegations do not state disparate impact claims.

The parties are advised:

1.    Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this Report and Recommendation within fourteen days of receipt.  These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.    This Report and Recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

## V.     RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that defendants' motion for summary judgment (#45) be **GRANTED**;

**IT IS FURTHER RECOMMENDED** that plaintiff's motion for summary judgment (#34) be **DENIED**;

**IT IS FURTHER RECOMMENDED** that the Clerk **ENTER JUDGMENT** and close this case.

**DATED:**  February 17, 2015**.**

_Valerie P. Cooke_
_____
**UNITED STATES MAGISTRATE JUDGE**